FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

2015 APR -7  AM 9: 00

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____

**CHARLES KEITH DURRETT and CYNTHIA
DURRETT,**
                    **Plaintiffs,**

-vs-                                                           **Case No.  A-14-CA-167-SS**

**NATIONWIDE PROPERTY AND CASUALTY
INSURANCE COMPANY,**
                    **Defendant.**

---

## O R D E R

    BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Defendant Nationwide Property and Casualty Insurance Company's Motion for

Summary Judgment [#18], Plaintiffs Charles Keith Durrett and Cynthia Durrett's Response [#19],

Plaintiffs' Objections to Defendant's Motion for Summary Judgment [#20], and Defendant's Reply

[#21].  Having reviewed the documents, the relevant law, and the file as a whole, the Court now

enters the following opinion and orders GRANTING the motion.

### Background[1]

**A.**     **The Incident, the Policy, and the Investigation**

    Plaintiffs Charles Keith Durrett (Durrett) and Cynthia Durrett purchased a homeowner's

insurance policy issued by Defendant Nationwide Property and Casualty Insurance Company

---

[1] The Court notes at the outset much of what the parties—and in particular the plaintiffs—attached to their
summary judgment briefing amounts to hearsay statements unaccompanied by supporting affidavits. Most of the hearsay
at issue are statements produced in discovery by Nationwide but submitted and relied upon by Plaintiffs. The Court has
considered much of this hearsay to the extent the parties have not objected. Where the parties have objected to specific
examples of hearsay, the Court notes and rules on the objection.

(Nationwide) bearing policy number 78 42 HO 386998 (the Policy) with a policy period of October 15, 2012, to October 15, 2013, to insure their property at 3712 River Oaks Drive in Kingsland, Texas.  *See* Mot. Summ. J. [#18-1] Ex. A (the Policy).  Central in this case is the house's plumbing system, and the parties do not appear to dispute the relevant components of that system.  To begin, there is a storage tank located immediately adjacent to the home.  Resp. [#19-1] Ex. 1 (Durrett Aff.) ¶ 4.  Inside the tank is a grinder pump, and there is a check valve and a quick-disconnect coupling located in the discharge line.  *Id.*; Mot. Summ. J. [#18-3] Ex. B-1 (Schober Report) at 3.  At various times materials in the tank will be pumped through the disconnect coupling and then through underground piping approximately 100 feet to the boundary line of the property.  Durrett Aff. ¶ 4.  The piping is sloped uphill from the storage tank to the property's boundary line where the piping ends into a second check valve belonging to the Kingsland Municipal Utility District (KMUD).  Schober Report at 3.  The KMUD check valve connects to the KMUD piping running underneath River Oaks Drive.  Durrett Aff. ¶ 4.

On June 2, 2013, a neighbor called Durrett to notify him of an odor coming from the Durretts' house.  *Id.* ¶ 5.  Durrett called KMUD to report possible sewage water accumulating in the house.  *Id.*  KMUD sent an operator to the house on June 2 to respond to the reported "overflow" problem.  *See id.* [#19-9] Ex. 9 (KMUD Service Call Sheets) at 1.  The operator indicated the "kamlock came undone," and he "reconnected and taped" it.  *Id.*  The reconnection of the disconnect coupling[2] stopped the flow of sewage water into the house.  Durrett Aff. ¶ 5.

---

[2] The "kamlock" referred to in the KMUD Service Call Sheets would appear to refer to what the parties call the "quick-disconnect coupling," the "diconnect coupling," or the "coupling."  *Compare* Service Call Sheets at 1, *with* Durrett Aff. ¶ 4, *and* Schober Report at 3, 6.

Durrett reported the issue to Nationwide and also called a company, ServPro, to come and pump the water out of the house. *Id.* ¶ 6. On June 3, 2013, Nationwide adjuster William Wimp met Durrett at the house while ServPro pumped water out of the house and into the residence's storage tank. *Id.* At this point, there appears to be no dispute the water was no longer flowing into the house, and ServPro was effectively pumping the water out of the house into the storage tank. *Id.*

On June 4, 2013, KMUD sent another operator out to the house to address a reported problem of a "bad street check." KMUD Service Call Sheets at 2. A "street check" refers to the check valve at street level. The KMUD operator "replace[d]" the "street check," and "put in [a] meter box."[3] *Id.*

The sewage water overflow caused significant damage to the Durretts' home in the amount of $37,076.72 (actual cash value) and $38,961.29 (replacement cost value). *See* Reply [#21-1] Ex. A (Nationwide Damage Estimate) at 25. Plaintiffs filed a claim with both KMUD and Nationwide. The Texas Municipal League Intergovernmental Risk Pool (TMLIRP), on behalf of KMUD, denied Plaintiffs' claim, stating it had concluded, based on its investigation, the damages as a result of the overflow "were not caused by any wrongful act, omission or negligence on the part of the Kingsland MUD or any of its employees." Resp. [#19-6] Ex. 6 (TMLIRP Denial Letter).

Plaintiffs' Nationwide claim was filed pursuant to the Policy. The Policy contains the following relevant exclusion for "[w]ater or damage caused by water-borne material":

---

[3] Plaintiffs claim in their response that "[t]he KMUD operator told Mr. Durrett that there was nothing wrong with the prior KMUD check valve but they were replacing it as a precautionary measure." Resp. [#19] ¶ 6. Nationwide objects to the statement as hearsay. Reply [#21] ¶ 4. The Court SUSTAINS the objection and does not consider the inadmissible hearsay statement.

1.    We do not cover loss to any property resulting directly or indirectly from any of the following.  Such a loss is excluded even if another cause or event contributed concurrently or in any sequence to cause the loss.

. . .

b)    Water or damage caused by water-borne material.  Loss resulting from water or water-borne material damage described below is not covered even if other perils contributed, directly or indirectly to cause the loss. Water and water-borne material damage means:

. . .

(2)    water or water-borne material which:

(a)    backs up through sewers or drains from outside the dwelling's plumbing system . . . .

The Policy at D1.

The Policy also includes optional coverages, and Plaintiffs purchased some of those options, including Option R for "Broad Water Back up of Sewers or Drain Coverage," which has a limit of liability of 5% of Coverage A, which has a limit of $168,000.  *Id.* at 1–2 (Policy Declarations). Specifically, Option R provides Nationwide will "pay up to a maximum of five (5) percent of the Coverage A . . . for direct damage to covered property caused by or resulting from water or water-borne material which: 1. backs up through sewers or drains from outside the dwelling's plumbing system; or 2. overflows from a sump pump, sump pump well or other system designed to remove subsurface water or water-borne material from the foundation area."  *Id.* at K6–K7.

In responding to Plaintiffs' claim, Wimp of Nationwide hired a plumber, David DeMoss, to conduct an investigation, and DeMoss submitted his invoice to Nationwide on June 10, 2013. *See* Mot. Summ. J. [#18-5] Ex. D (Wimp Decl.) ¶ 4; Resp. [#19-7] Ex. 7 (DeMoss Invoice). DeMoss noted in his invoice:

INVESTIGATION FOUND SWING CHECK VALVE AT GRINDER PUMP HAD
FAILED ALLOWING SEWAGE TO DRAIN BACK INTO HOME.  CITY HAS
INSTALLED A SECOND SWING CHECK VALVE UP BY STREET TO HELP
PREVENT FUTURE FAILURES.

*Id.*

On June 24, 2013, in a note in the Nationwide Claim File, Wimp documented a telephone

call he had with DeMoss in which DeMoss reiterated his belief the check valve at the grinder pump

failed.  *See* Resp. [#19-8] Ex. 8 (Nationwide Claim File) at NW/Durrett 045.  DeMoss also stated

he did not believe there had previously been a check valve at the street before KMUD installed one

on June 4, 2013.  *Id.*  According to Wimp, DeMoss reasoned (sic throughout):

> If no check valve at street which is common . . .  and the main sewer is under
> pressure. The dwelling sewer lines are also under pressure and have sewage in them
> constantly all the way to the grinder pump.  When sewage comes out of the house
> and into the grinder pump it fills up to a float that turns the pump on and the swing
> check value opens and the pump pushes the house sewage and the sewage in the
> dwelling sewer line up hill to the sewer main at the street. When the float goes back
> down, the swing check valve closes and the pump turns off.  If the check valve at the
> grinder pump failed to close this could cause the back up into the house. . . . Going
> over with David the member's timeline as outlined in his recent email, it makes more
> since that the check valve at the grinder pump failed.  Otherwise when Servpro
> started dumping water from the house with their hoses into the grinder pump on
> Monday and the check valve at the street had not been replaced yet (not until
> Tuesday) as it did not exist and was put in later by MUD as a precaution (per the
> member's emal) to prevent future back ups, you would have not another overflow.
> Since you didn't have another overflow and the MUD had been out and made their
> inspection and adjustment to the grinder pump and presumably to the check valve
> and everything was working in good order with no overflows.

*Id.*

On June 27, 2013, Wimp, on behalf of Nationwide, issued a Policy limit payment of

$8,595.54 to Plaintiffs for liability limit under Option R.  *See* Mot. Summ. J. [#18-5] Ex. D (Wimp

Decl.) ¶ 7–8.  In a letter sent to Plaintiffs on the same day, Wimp explained he spoke with Kirk

Austin of the Littleton Group and Anita LaBier from KMUD. Nationwide Claim File at NW/Durrett

312–13. They both advised Wimp (1) the cause of the sewer backup was the failure of the check

valve at the main at the street level, (2) KMUD replaced the check valve at the street with a new

check valve, and (3) KMUD did no work on the check valve at the grinder pump. *Id.* Wimp also

indicated he spoke further with DeMoss who could only say there was a new check valve installed

at the street, but he did not know if there had been one before the incident of June 2, 2013. *Id.*

Regarding the check valve at the grinder pump, DeMoss told Wimp it was not new and had not been

replaced although it could have been worked on or replaced with a used check valve; DeMoss did

not know for sure except that the check valve at the grinder pump was not new. *Id.* Given these

reports, Wimp informed Plaintiffs: "Based on what the MUD has told us, it's our opinion that the

back up came from outside the dwelling's plumbing system, as the check valve at the street (owned

by the MUD) failed and sewage from the main sewer backed up into your house. Therefore, based

on the coverage you have we can pay 5% of the Coverage A (Dwelling Limit-$171,910.79) or

$8,595.54 for your dwelling and contents loss." *Id.*

    Durrett did not agree with Wimp's assessment, and he exchanged messages with Wimp and

Wayne Nuegen, another Nationwide adjuster, to discuss their disagreement. *See id.* at NW/Durrett

312, 353–54, 362, 372–376. Durrett's basic position was that the backflow of waste stopped the

night of June 2, 2013, after the first KMUD operator's visit to the house. *Id.* at NW/Durrett 353–54.

Durrett further emphasized that the next day, ServPro was able to effectively pump water out of the

house and into the storage tank, and it was not until the day after that on June 4, 2013, that the

second KMUD operator performed any work on the street check valve. *Id.* Therefore, Durrett

insisted the failure causing the backup occurred at the dwelling's plumbing system, not at the city's

plumbing system, and in Durrett's view, this meant the exclusion did not apply. *Id.* As of July 1, 2013, Nationwide told Durrett "[w]e continue to investigate your claim. Should the facts of our investigation determine that an adjustment in the application of coverage is warranted, we will inform you of that decision." *Id.* at NW/Durrett 373.

On August 9, Wimp, apparently as part of the continuing inquiry into Plaintiffs' claim, discussed an additional investigation with an engineer, Greg Schober of Nelson Architectural Engineers. *Id.* at NW/Durrett 031, 493; Wimp Decl. ¶ 4. On August 13, 2013, Schober investigated the property, and on August 16, 2013, he submitted his report to Nationwide. Schober Report at 1. Schober's "Authorization and Purpose" was "to evaluate the sanitary sewer backup event that occurred on June 2, 2013, determine the cause of the backup event, and determine if the failure occurred on the premises or outside of the premises." *Id.* In addition to his on-site observations and an interview with Durrett, Schober based the conclusions in his report on: (1) the DeMoss Invoice; (2) "email strings between the involved parties provided by William Wimp;" (3) the KMUD Service Call Sheets; and (4) the Nationwide Damage Estimate. *Id.* at 1–2. In his "Analysis," Schober lays out his assessment of what occurred in the plumbing system on June 2, 2013:

> [T]wo failures occurred in the building sewer: the check valve at the street failed open and the quick-disconnect fitting at the ejector sump became disconnected. These two component failures opened a path for sewage from the city force main to be forced under pressure into the ejector pit, and from there to back-up into the structure through building drain pipes. The ejector pump and the check valve in the ejector pit did not fail, and were not involved in the backup event.
>
> The KMUD service call sheet dated 6/2/2013 indicates that on June 2, 2013 (the evening of the event) KMUD performed a service call and re-connected the quick-disconnect cam-lever coupling on the discharge line of the ejector pump. The reconnection of this fitting placed the house sewage ejector system back into operation (as confirmed by Servpro's successful use of the sump for waste disposal on June 3), and indicates that neither the ejector pump nor the check valve in the

ejector sump had failed.  The quick-disconnect coupling is located on the premises. *If the quick-disconnect coupling had not failed, the back-up event would not have occurred*.  This information is consistent with the homeowner's account of what KMUD accomplished that evening, as reported to him by his neighbor.

The KMUD service call sheet dated 6/4/2013 indicates that on June 4, KMUD returned and installed a new check valve at the street, consistent with the homeowner's observations (**Figures 11** and **12**).  The service call sheet indicates that the new check valve was installed in a meter box.  The replacement of this check valve is an indication that KMUD had determined its original check valve (buried underground) had failed, and is consistent with the back flow of sewage that occurred on the evening of June 2.  The failed check valve is located outside of the premises. *If the check valve at the street had not failed open, the back-up event would not have occurred*.  This information is consistent with the homeowner's account of the events on that day.

The check valve was originally buried under approximately 3' of earth, a location which precludes all check valve maintenance activities.  These check valves require regular maintenance, including disassembly to clean the internal parts; with the valve buried, these essential maintenance activities could not have been performed.  The June 4, 2013 at-grade installation of the replacement check valve in a valve box is correct; the replacement valve is readily accessible for maintenance.  The failure of the check valve at the street and the subsequent sewage back-up event is therefore related to the improper (below grade) installation of the original valve.

*Id.* at 6–7.

In sum, Schober makes the following four conclusions:

1. The sewer backup event occurred as a direct result of two concurrent system failures: the failure of the KMUD check valve at the street and the failure of the cam-level quick-disconnect coupling in the ejector pump discharge pipe in the ejector sump;

2. The backup event would not have occurred if either of these two failures had not occurred;

3. The failed quick-disconnect coupling was located on the premises and the failed check valve was located outside the premises;

4. The sequence of the check valve failure and the quick-disconnect coupling is undetermined.

*Id.* at 8.

On August 15, 2013, Wimp noted in the claim file he had met with Schober, DeMoss, and Durrett, and while Nationwide had initially thought the backup came from off the premises based only on the failure of the street check valve, Schober indicated there was both a failure of the street check valve and a failure of the quick-disconnect coupling at the grinder pump. Nationwide Claim File at NW/Durrett 028. Nevertheless, Nationwide thought the Schober Report made clear these two failures resulted in sewage from the city line entering the insured property. *Id.* at NW/Durrett 027. On September 5, 2013, Nationwide sent the Durretts a letter informing them it had completed its investigation and concluded:

> Our investigation showed that there were two concurrent system failures, the failure of the KMUD check valve at the street and the failure of the cam-lever quick-disconnect coupling in the grinder pump discharge pipe in the grinder pump. These failures opened a path for sewage from the city force main (outside the dwelling's plumbing system) to be forced under pressure into the grinder pump and from there to back-up into the dwelling through the dwelling drain pipes. Therefore, based on our investigation and the above policy language the sewer back up that damaged your property came from outside the dwelling's plumbing system and is limited to 5% of Coverage A limit, for dwelling and contents damages.

Resp. [#19-10] Ex. 10 (Nationwide Letter) at 2.

## II.    The Current Lawsuit

On January 4, 2013, Plaintiffs filed the instant lawsuit against Nationwide in the 33rd Judicial District Court of Llano County, Texas, and Nationwide was served with the Petition on January 30, 2014. *See* Notice Removal [#1] at 1. Plaintiffs contend Nationwide's coverage determination was incorrect. *See* Supplement to Notice Removal [#5-1], Original Petition (Orig. Pet.) ¶ 14. For this position, Plaintiffs block-quote two paragraphs from the Schober Report and specifically highlight Schober's conclusion that but for the failure of the quick-disconnect coupling at the ejector pump,

the back-up event would not have occurred. *Id.* ¶ 9.  Plaintiffs attached the Schober Report to their petition. *Id.* Ex. B.[4]

Plaintiffs stated theory in the petition for why Nationwide's Policy interpretation is incorrect is that since the quick-disconnect coupling, which was part of the residence's plumbing system, failed, then the policy exclusion for water or water-borne material that backs up through sewers or drains from outside the dwelling's plumbing system did not apply. *Id.* ¶ 14.  In other words, Plaintiffs focus on the location of the failure and not the origin of the water or water-borne material. Relatedly, Plaintiffs argue the exclusion is inapplicable where the failure of one of the components of the residence's plumbing system "allowed water to enter the dwelling through the dwelling's internal plumbing system." *Id.* ¶ 17.  In other words, Plaintiffs focus on the fact the sewage water made its way into the house through the dwelling's plumbing system and that simple fact makes the exclusion inapplicable.

Plaintiffs assert causes of action for: (1) breach of contract; (2) violations of Chapters 541 and 542 of the Texas Insurance Code; (3) breach of the Texas Deceptive Trade Practices Act (DTPA); and (4) breach of the common law duty of good faith and fair dealing. *Id.* ¶¶ 19–33. Alternatively, Plaintiffs assert "the Policy provisions at issue are ambiguous and must be construed

---

[4] Plaintiffs object to Nationwide highlighting Plaintiffs' reliance on the Schober Report in their petition and the fact Plaintiffs attached the Schober Report to their petition. *See* Pls.' Objections [#20] ¶ 2.  Plaintiffs contend Nationwide "misquotes" the Plaintiffs' Original Petition and the Schober Report, and Plaintiffs' position is "more properly set forth" in its response to the motion for summary judgment. *Id.*  Nationwide did not misquote anything. Plaintiffs directly quoted the Schober Report for the truth of the statements contained therein, including (1) the check valve at the street level failed, (2) the quick-disconnect coupling at the ejector pump failed, and (3) as a result of these two failures, sewage from the city line beneath River Oaks drive ran down through the dwelling's sewer line and into the dwelling through its drains and plumbing fixtures.  Plaintiffs, apparently upon realizing the Schober Report actually contradicts their position, have tried to distance themselves from it through their untimely motion for leave to file an amended complaint and their objection to its conclusions as "conclusory statement[s] unsupported by any evidence attached to Defendant's Motion for Summary Judgment and . . . improper to support a summary judgment motion." *Id.* Yet Plaintiffs introduced the Schober Report in the first place, and they have designated Schober and his report in their expert disclosures.  The objection is remarkable and OVERRULED.

in favor of the insureds who tendered a reasonable interpretation of the policy provisions at issue." *Id.* ¶ 34.

On February 25, 2014, Nationwide removed the case to this Court. *See* Notice Removal [#1]. On April 17, 2014, the Court entered a scheduling order, which included the following relevant deadlines: (1) November 10, 2014, for amended pleadings; (2) November 3, 2014, for Plaintiffs' expert disclosures (along with expert reports); (3) February 9, 2015, for discovery; (4) February 16, 2015, for dispositive motions; and (5) November 2015 for trial. *See* Order of Apr. 17, 2014 [#8].

Plaintiffs designated the following experts and expert reports: (1) William Wimp and Wayne Neugen (Nationwide's claim adjusters) and the Nationwide Damage Estimate they prepared; (2) Schober and the Schober Report; (3) DeMoss and the DeMoss Invoice; and (4) Plaintiffs' counsel on the topic of attorney's fees. *See* Mot. Summ. J. [#18-4] Ex. C (Pls.' Expert Designations). Plaintiffs designated no other experts.

On February 16, 2015, Nationwide moved for summary judgment, Plaintiffs responded on March 2, 2015, and Nationwide replied on March 9, 2015. Two days after the filing of Nationwide's reply, Plaintiffs moved for leave to file an amended complaint in which Plaintiffs indicated, among other things, "no depositions have been taken," and "discovery to date has consisted of the exchange of disclosures only." Pls.' Mot. Leave [#22] ¶ 10. An inspection of the amended complaint's "Facts" section shows Plaintiffs' counsel simply copied-and-pasted paragraphs from the response to the motion for summary judgment. *Compare* Resp. [#19] ¶¶ 1–19, *with* Mot. Leave [#22-1] Ex. 1 (Am. Compl.) ¶¶ 5–24. For various reasons, the Court denied Plaintiffs' motion as they offered no good reason for the untimeliness of their requests. *See* Order of Mar. 20, 2015 [#26]. As a result,

the Original Petition remains the live complaint in this case, and Nationwide's motion for summary judgment, predicated on the Original Petition, is ripe for review.

## Analysis

### I.      Legal Standards—Summary Judgment

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are

not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.   Application

### A.   Insurance Coverage and Exclusions

Plaintiffs' primary claim is breach of contract as they dispute Nationwide's application of the exclusion and resort to Option R.

#### 1.   Legal Standards

Because this is a diversity action, Texas substantive law applies. *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010). Under Texas law, the insured has the initial burden of establishing coverage under the terms of the policy. *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). If the insured proves coverage, then in order to avoid liability, the insurer must prove the loss is within an exclusion. *Id.* If the insurer proves an

exclusion applies, the burden shifts back to the insured to show an exception to the exclusion brings the claim back within coverage. *Id.*

In Texas, insurance contracts are subject to the same rules of construction applied to other contracts. *Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001). The principles Texas courts use when interpreting an insurance policy are well-established and include construing the policy according to general rules of contract construction to ascertain the parties' intent. *Gilbert Tex. Const.*, 327 S.W.3d at 126. Courts first examine the language of the policy and assume parties intend what the words of their contract say. *Id.* Next, courts examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless. *Id.* "The policy's terms are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense." *Id.* "Courts strive to honor the parties' agreement and not remake their contract by reading additional provisions into it." *Id.*

A contract is ambiguous if, after applying the rules of contract interpretation, a provision remains reasonably susceptible to two meanings. *Gomez v. Hartford Co. of the Midwest*, 803 S.W.2d 438, 441–42 (Tex. App.—El Paso 1991, writ denied). If the language is ambiguous, courts apply the doctrine of *contra proferentem* and construe the contract against the insurer. *Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676–77 (Tex. App.—Austin 2003, no pet.). For the court to even consider applying this doctrine, it must actually determine the disputed provisions are ambiguous because the doctrine "is a device of last resort employed by courts when construing ambiguous contractual provisions." *Id.* "It is essentially a tie-breaking device used to prevent arbitrary decisions when all other methods of interpretation and construction prove unsatisfactory." *Id.*

2.      **Application**

As an initial matter, there appears to be no dispute there is coverage under the Policy for the type of loss suffered by Plaintiffs pursuant to "Coverage A–Dwelling." The question becomes whether Nationwide has proved the loss is within an exclusion. Nationwide asserts the exclusion for damage caused by "water or water-borne material which backs up through sewers or drains from outside the dwelling's plumbing system" applies. Nationwide further asserts the optional coverage, Option R, which provides coverage for damage caused by "water or water-borne material which backs up through sewers or drains from outside the dwelling's plumbing system" at a limit of 5% of Coverage A, applies. Indeed, Nationwide has paid Plaintiffs in accordance with this interpretation of the Policy. Plaintiffs dispute the applicability of the exclusion and argue, alternatively, the exclusion is ambiguous. After assessing both the admissible and inadmissible record, the Court finds Nationwide has established the applicability of the exclusion, and Plaintiffs have failed to counter this conclusion by creating any fact issue.

Beginning with the admissible record, Nationwide provides the Wimp Declaration, in which Wimp, the adjuster, swears he (1) investigated the claim; (2) was assisted in his investigation by the plumber, DeMoss, and the engineer, Schober; (3) determined, through his investigation, the loss resulted from a back-flow of city sewer water down from the street-level city sewer line into the residence through the residence's drains and plumbing fixtures; and (4) the back-flow was caused by two concurrent system failures, the failure of the KMUD check valve at the street and the failure of the cam-lever quick-disconnect coupling in the grinder pump discharge pipe. Wimp Decl. ¶¶ 1–6. Based on these findings, Wimp concluded Plaintiffs were covered under Option R, and the remainder of the loss was excluded by the Policy. The Court agrees with this coverage determination

given the statements in the Wimp Declaration. A plain reading of the exclusion at issue ("water or water-borne material which backs up through sewers or drains from outside the dwelling's plumbing system") indicates that if the sewage water came down from the city sewer line, as Wimp's investigation led him to conclude, then the resulting loss is not covered, except pursuant to any relevant optional coverages like Option R. The Wimp Declaration is Nationwide's only admissible evidence on the related issues of where the plumbing failures occurred and whether the sewage water came from the city sewer line.

In response, Plaintiffs provide essentially no admissible evidence on these issues. The only admissible evidence they provide which could possibly bear on them is the sworn affidavit of Charles Keith Durrett (which itself contains inadmissible hearsay), in which he states (1) a KMUD operator arrived at the house on June 2, 2013, and reconnected a coupling that had come loose; (2) once the coupling was reconnected, water stopped flowing into the house; (3) the next day ServPro was able to effectively pump water out of the house and into the storage tank; and (4) on June 4, 2013, a second KMUD operator installed a new check valve at the street level. Durrett Aff. ¶ 5–7. None of these statements contradict Wimp's statements in his declaration. In particular, they do not challenge the finding that the sewage water, which backed up into the house, came from the city sewer line. Therefore, the summary judgment record is undisputed the sewage water that caused damage to the home came from the city sewer line, and the Court concludes, on this record, Nationwide made the proper coverage determination. The Court GRANTS Nationwide's motion for summary judgment based on this analysis alone and could end the discussion here. The Court, however, discusses the inadmissible record relied upon by Plaintiffs and the attorney argument made by Plaintiffs' counsel in the briefs.

-16-

The most significant piece of hearsay evidence is the Schober Report.  The report has been in the case from the beginning as Plaintiffs quoted the Schober Report in their Original Petition and attached it to their Original Petition.  Plaintiffs also disclosed Schober as an expert on causation and his report in their expert disclosures.  From Nationwide's standpoint, Wimp solicited Schober to create the Schober Report and relied on the Schober Report in arriving at his policy coverage conclusions.  The Schober Report, however, is hearsay, and no party has established its admissibility under any relevant exceptions.  Nevertheless, the Schober Report is clear in its opinion there were two failures, one in the city's plumbing system and one in the dwelling's plumbing system, both of which were but-for causes of the back-up.  More importantly, the Schober Report is clear in its opinion the sewage water backed up from the city sewer line.

While Plaintiffs initially relied upon the Schober Report in their Original Petition, they attack the credibility of the Schober Report in their response to the motion for summary judgment.  *See* Resp. [#19] ¶¶ 14–17.  Leaving aside the merits of Plaintiffs' objections to the Schober Report, there appears to be no dispute Schober is an expert, and his opinion is that the sewage water came down from the city sewer main.  Significantly, Plaintiffs can cite to no other item of evidence, admissible or not, contradicting this opinion, much less an opinion stating the sewage water came from somewhere other than the city sewer main.  Plaintiffs do, however, advance a number of unsupported arguments.

First, Plaintiffs argue the sewage intrusion would not have occurred but for the disconnected coupling at the grinder pump (which is consistent with the Schober Report).  Resp. [#19] ¶ 7.  From this premise, Plaintiffs' counsel makes the following leap: "The disconnected coupling caused a sudden and accidental discharge from the tank into the house."  *Id.*  Plaintiffs' counsel appears to be

implying the sewage water backed up from the dwelling's storage tank, rather than the city sewer line, and therefore the exclusion does not apply (or at least there is a fact issue). This conclusion, however, is no more than attorney argument and cannot support a finding the origin of the sewage water in the house came from the storage tank and not the city sewer line.

Second, Plaintiffs point to the DeMoss Invoice, which indicated DeMoss's belief that the swing check valve at the grinder pump failed. *Id.* ¶ 10. Plaintiffs also cite Wimp's notes from June 24, 2013, in the Nationwide Claim File, documenting his conversation with DeMoss. *Id.* ¶ 12. From these materials, Plaintiffs' counsel contends: "Although not stated, it is reasonable to infer that if the pump were operating with an opening in the pipe leading to the street, the pump would be unable to lower the level in the tank and would continue to operate, building up pressure inside the tank, thereby pumping the tanks' contents into the house." *Id.* Again, these "inferences" are simply attorney argument and are not evidence the sewage water that backed up into the house came from the storage tank. Neither the DeMoss Invoice nor Wimp's log note on his conversation with DeMoss function as competent evidence creating a fact issue on causation or the origin of the sewage water. Finally, the Court observes Plaintiffs have designated DeMoss and Schober as the only experts who could possibly opine on these issues. Yet Plaintiffs never disclosed an expert "report" for DeMoss except for the invoice he submitted; and the invoice only states DeMoss's opinion that (1) the swing check valve at the grinder pump failed, and (2) KMUD had installed a swing check valve at the street level to prevent future failures. To the extent the invoice even qualifies as a report, it states no opinion on whether the sewage water backed up from the city sewer line.[5]

---

[5]The Court notes a few other problems with the DeMoss Invoice and Wimp's log note of his conversation with DeMoss. First, DeMoss concluded the check valve at the grinder pump failed, and KMUD, during its first visit, stopped the flow of water into the house by fixing the check valve. *See* DeMoss Invoice; Nationwide Claim File at NW/Durrett

Third, Plaintiffs contend the applicability of the exclusion turns on the location of the plumbing failure, and according to Plaintiffs, the backup event was caused by a failure of the dwelling's plumbing system.  Plaintiffs draw this conclusion because the sewage water stopped flowing into the house once the KMUD operator reconnected the quick-disconnect coupling at the grinder pump on June 2, 2013.  The exclusion, however, does not describe whether the plumbing failure must occur inside or outside the dwelling's plumbing system.  Instead, the exclusion is for damage caused by "water or water-borne material which backs up through sewers or drains from outside the dwelling's plumbing system." This language unambiguously turns on whether the water or water-borne material comes from outside the dwelling's plumbing system.  In other words, the plumbing system failure causing the backup could occur inside or outside the dwelling's plumbing system, but the water or water-borne material must come from outside the dwelling's plumbing system.

Nevertheless, even if Plaintiffs' argument about the location of the failure was on point, their conclusions are consistent with the Schober Report, which points out the backup event would not have occurred if not for both the quick-disconnect coupling failure (inside the dwelling's plumbing system) and the failure of the street check valve (outside the dwelling's plumbing system).

---

045 ("MUD had been out and made their inspection and adjustment to the grinder pump *and presumably to the check valve* and everything was in good order with no overflows." (emphasis added)).  Yet no other party, including Plaintiffs themselves, contend that is actually what happened.  The KMUD Service Sheets, Wimp's conversations with KMUD representatives, and the Schober Report all indicate the first KMUD operator reconnected the quick-disconnect coupling at the grinder pump.  Durrett, in his affidavit, agrees the first KMUD operator fixed the quick-disconnect coupling and says nothing about any problems with the check valve at the grinder pump. *See* Durrett Aff. ¶ 5.  As for the street check valve, DeMoss did not think there had been such a valve previous to the events of June 2, 2013, but all other parties, including Durrett, agree the second KMUD operator replaced a previously existing street check valve with a new street check valve.  Finally, DeMoss's diagnosis, as recorded by Wimp, does not even rule out the possibility the sewage water came from the city sewer line. *See* Nationwide Claim File at NW/Durrett 045 ("If no check valve at street which is common according to David and the main sewer is under pressure.  The dwelling sewer lines are also under pressure and have sewage in them constantly all the way to the grinder pump.").  In the end, DeMoss does not offer any clear opinion on the origin of the sewage water which invaded Plaintiffs' home.

Plaintiffs' counsel argues Schober cannot be right because if he were, then fixing only the quick-disconnect coupling would not have stopped the sewage water from flowing into the house as it did. But again this is no more than attorney argument unsupported by any evidence. Furthermore, the contention strikes the Court as logically incorrect.

Moreover, the Policy's exclusions apply to losses "even if another cause or event contributed concurrently or in any sequence to cause the loss." Policy at D1. As such, even under Plaintiffs' theory, the failure inside the dwelling's plumbing system does not render the exclusion inapplicable because the failure outside the dwelling's plumbing system concurrently caused the loss according to the unopposed Schober Report.

Fourth, Plaintiffs contend the Policy is ambiguous because it is unclear whether the applicability of the exclusion depends on: (1) whether the plumbing system failure occurred inside or outside the dwelling's plumbing system; or (2) whether sewage water that backed up into the house came from inside or outside the dwelling's plumbing system. Plaintiffs suggest Nationwide has at different times advanced both of these interpretations, which proves the ambiguity of the Policy. The Court disagrees. Even assuming Plaintiffs accurately characterize Nationwide as offering conflicting interpretations of the exclusion, it is irrelevant to whether the exclusion is ambiguous.[6] The focus of the ambiguity inquiry is the language of the Policy, not Nationwide's

---

[6] Plaintiffs' are also simply wrong about Nationwide's representations. According to Plaintiffs, Wimp, in his letter of June 28, 2013, indicated the determining factor for coverage was the location of the failure. *See* Resp. [#19] ¶ 34. In that letter, Wimp, after having paid Plaintiffs under Option R, told Durrett he should obtain copies of KMUD's works orders, and if those reports "contain[ed] information that the check valve at the grinder pump failed and was repaired or replaced, then we obviously would reconsider our previous claims decision." Nationwide Claim File at NW/Durrett 362. This statement merely indicates Wimp would reconsider the coverage determination if Durrett brought forth information indicating a failure of the check valve at the grinder pump; it does not mean the exclusion would not apply based on such information alone. The location of the failure is related to and informs the question of where the sewage water originated. For example, if the check valve at the grinder pump failed (and not the check valve at the street), then the sewage water may not have come from the city sewer line. Wimp's invitation to Durrett to provide information on failures of the dwelling's plumbing system is not inconsistent with Wimp's decision to apply the exclusion

interpretation. Plaintiffs' argument regarding Wimp's supposedly conflicting statements about the scope of the Policy, which already depends on hearsay, also asks the Court to consider parol evidence, which is inadmissible for the purpose of creating an ambiguity. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). "The ambiguity must become evident when the contract is read in context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity." *Id.* The plain language of the exclusion is unambiguous; the water or water-borne material must back up through sewers or drains from outside the dwelling's plumbing system.

Fifth, Plaintiffs argue "[t]here is not a single shred of evidence" of a "back up." Resp. [#19] ¶ 27. Plaintiffs' counsel makes this claim despite the fact he referred to the loss at issue as "the back-up" event in the Original Petition and the fact Durrett, in correspondence with Nationwide, described the event of June 2, 2013 as a "back up." *See* Orig. Pet. ¶ 14; Nationwide Claim File at NW/Durrett 243–44. Plaintiffs rely on the dictionary definitions of "back up" as "to accumulate in a congested state" and "backup" as "an accumulation by a stoppage in the flow." Resp. [#19] ¶ 26. The Court finds Plaintiffs' semantical arguments, which conflict with their own previous usage, unhelpful and disconnected from the plain language of the Policy, which simply excludes damage caused by "water or water-borne material which backs up through sewers or drains from outside the dwelling's plumbing system." Read in context, there is nothing confusing or ambiguous about the

---

based on his finding the sewage water came from the city, a rationale he repeated multiple times in correspondence with Plaintiffs. *See id.* at 312–13 (letter of June 27, 2013); *id.* at 362 (letter of June 28, 2013); Resp. [#19-10] Ex. 10 (letter of Sept. 5, 2013). Finally, it is important to note Plaintiffs, after receipt of Wimp's letter, never actually brought forth the KMUD reports or any other evidence of a failure of the check valve at the grinder pump. In fact, the KMUD Service Call Sheets indicate KMUD operators only (1) reconnected the quick-disconnect coupling on June 2, 2013, and (2) replaced the street check valve on June 4, 2013. KMUD did not perform work on the check valve at the grinder pump. The Schober Report and Nationwide's coverage determination are consistent with KMUD's work history.

language "backs up," and the record shows sewage water did, in fact, "back up" through the dwelling's sewers or drains into the house.

Sixth, in their Original Petition, Plaintiffs suggest the policy exclusion is inapplicable because the sewage water entered the house through the dwelling's plumbing system. *See* Orig. Pet. ¶¶ 15, 17. Under this view, the exclusion applies where sewage overflows drains or sewers located off the dwelling's premises and subsequently enters the dwelling "for example through openings under doorways and exterior walls." *Id.* ¶ 15. In contrast, Plaintiffs argue this case, which involved a "sudden and accidental discharge or overflow of water from within the dwelling's plumbing system[,] is clearly a covered loss under Coverage A and C of the Policy." *Id.* ¶ 17. In a related argument, Plaintiffs cite authorities interpreting surface water exclusions in the insured's policies. Resp. [#19] ¶ 31 (citing *Jackson v. Am. Mut. Fire Ins. Co.*, 299 F. Supp. 151, 156 (M.D.N.C. 1968), *aff'd* 410 F.2d 395 (4th Cir. 1969); *State Farm Lloyds v. Marchetti*, 962 S.W.2d 58 (Tex. App.—Houston [1st Dist.] 1997, pet. denied)). Based on these authorities, Plaintiffs contend the exclusion in this case "is not applicable as there was no flood or water accumulation which caused the intrusion." Resp. [#19] ¶ 32.

The court rejected similar arguments in a similar set of circumstances in *For Kids Only Child Development Center, Inc. v. Philadelphia Indemnity Insurance Co.*, 260 S.W.3d 652, 655–56 (Tex. App.—Dallas 2008, pet. denied). In *For Kids Only*, a day care center was flooded with sewage flowing from floor drains in the building. *Id.* at 653. The overflow was caused by a stoppage in the city sewer main. *Id.* The insurance policy excluded damage caused by "[wa]ter that backs up or overflows from a sewer, drain or sump." *Id.* The insured had also purchased optional insurance, however, in which the insurer agreed to pay for loss caused by "flood damage or water that backs

-22-

up from a sewer, drain or sump" at a limit of $25,000. *Id.* at 654. The insurer determined the exclusion applied but paid the insured $25,000 under the optional insurance. *Id.* The insured disputed this coverage determination and characterized the sewage overflow event as an "accidental discharge or overflow from a plumbing system" that does not trigger the sewer and drain backup exclusion. *Id.* at 654–55. The insured relied on authorities interpreting surface water exclusions to support its position, including *Marchetti*. *Id.* at 655.

The Texas Fifth Court of Appeals analyzed the surface water exclusion cases, but "in light of the clear language in the insurance policy at issue," did not find them persuasive. *Id.* The court reasoned that "[r]eading the exclusion so as to eliminate instances where water has traveled through the [insured's] plumbing system would, in effect, be reading the exclusion out of the policy." *Id.* (citing cases including *Jackson*). Therefore, the court concluded "the policy unambiguously exclude[d] from coverage the type of drain and sewer backup [the insured] experienced." *Id.*

The circumstances of the instant case strongly resemble those in *For Kids Only*. Both involve sewage flowing into a building through the building's plumbing system. Both entail exclusions that are very similar (water "which backs up through sewers or drains from outside the dwelling's plumbing system" versus water "that backs up or overflows from a sewer, drain or sump"). Both insurance companies determined the exclusion applied but paid the insureds under optional coverage provisions. Both insureds disputed this policy interpretation and characterized the events as "accidental discharges" from within the building's plumbing system. Both insureds relied on cases involving surface water exclusions; indeed, they relied on some of the same cases. And just as the court in *For Kids Only* turned to the clear language of the exclusion to reject the plaintiff day care center's argument, so does this Court rely on the plain language of the exclusion to reject

Plaintiffs' contentions.  To adopt their interpretation would "be reading the exclusion out of the policy."

In sum, Plaintiffs have failed to create any fact issue on the coverage determination.  The undisputed record shows Nationwide was correct in its interpretation of the Policy, and the Court concludes Nationwide is entitled to summary judgment on the breach of contract claim.

**B.     The Other Claims**

Plaintiffs's remaining claims are for breaches of the common law duty of good faith and fair dealing as well as violations of the Texas Insurance Code and the DTPA.

**1.     Legal Standard**

The threshold of bad faith is reached when a breach of contract is accompanied by an independent tort.  *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994).  Evidence merely showing a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith.  *Id.*  Moreover, a determination of no coverage in a breach of contract claim negates a plaintiff's common law and statutory bad faith claims absent extreme conduct and independent injury.  *Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 922 (Tex. 2005).

Claims under the Texas Insurance Code and DTPA require the same predicate for recovery as a bad faith cause of action.  *See Higginbotham v. State Farm Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997) (noting "Texas courts have clearly ruled that [claims under the Texas Insurance Code and the DTPA] require the same predicate for recovery as bad faith causes of action in Texas") (citing Texas cases).  "Plainly put, an insurer will not be faced with a tort suit for challenging a claim of coverage if there was any reasonable basis for denial of that coverage."  *Id.*

2.      **Application**

All of Plaintiffs' extra-contractual claims are based upon the same allegations underlying the breach of contract claim or, in other words, the alleged failure to pay what is owed under the Policy. As the Court previously discussed, the current summary judgment record establishes Nationwide made the proper payment under the Policy, and Plaintiffs are not entitled to any further coverage. As a result, Plaintiffs' extra-contractual claims are negated. Moreover, there is no evidence of extreme conduct on the part of Nationwide or independent injury.

Even if Plaintiffs had been able to establish Nationwide was incorrect to limit coverage to Option R, or even create a fact issue, the Court finds there was a *bona fide* dispute as to coverage, and therefore the extra-contractual claims again fail. Plaintiffs have offered no evidence indicating Nationwide was unreasonable or acted in bad faith.

## Conclusion

On the current summary judgment record, the only admissible evidence indicates the sewage water which backed up into Plaintiffs' house on June 2, 2013, came down from the city sewer line. Based on this finding, Nationwide properly applied the exclusion for damage caused by "water or water-borne material which backs up through sewers or drains from outside dwelling's plumbing system." Consideration of the inadmissible evidence leads to the same conclusion. Plaintiffs offer mostly attorney argument and fail to present competent evidence creating any genuine disputed issue of material fact.

Accordingly,

IT IS ORDERED that Defendant Nationwide Property and Casualty Insurance Company's Motion for Summary Judgment [#18] is GRANTED.

SIGNED this the ____ day of April 2015.


SAM SPARKS
UNITED STATES DISTRICT JUDGE